UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                              CASE NO. 8:20-CR-00165-MSS-AAS

JAMES WESLEY MOSS,
EDWARD CHRISTOPHER WHITE, JR.,
DAVID BYRON COPELAND, and
MICHAEL ALTON GORDON

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT WHITE'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF UNCHARGED  CONDUCT

The United States respectfully submits this response in opposition to

defendant Edward Christopher White's Motion *in Limine* to Exclude 404(b)

Evidence Concerning Genetic Testing ("defendant's motion")(doc. 115), filed on

August 6, 2021.  As explained herein, the defendant's motion should be denied

because the proffered evidence at issue is relevant and properly admissible for the

purposes enumerated by Rule 404(b) to show White's motive, intent, preparation,

plan, knowledge, and/or absence of mistake.  The strong probative value of the

proffered evidence establishes White's criminal intent and significantly outweighs the

danger of unfair prejudice, if any.  Further, introduction of the proffered evidence at

trial will be narrowly focused on the enumerated purposes for such evidence under

Rule 404(b) and will not become a "mini-trial," nor will it waste time, confuse the

issues, or mislead the jury.

# I. BACKGROUND

A. <u>The Criminal Charges Against Edward Christopher White</u>

Edward Christopher White ("Chris White" or "White") is a pharmacist by training and owner of Mediverse, LLC ("Mediverse") and a co-owner (with co-defendant Moss) of Helix Management Solutions, LLC ("Helix"). White, through Mediverse, performed various consulting and sales marketing services for Florida Pharmacy Solutions ("FPS"), a compounding pharmacy owned by co-defendants Moss and Copeland. Doc 1 at 1-2. The Indictment alleges that White participated in a conspiracy to defraud the United States and to pay and receive illegal kickbacks in return for referring prescriptions to FPS that were reimbursed by TRICARE, a federal health care benefit program. Doc. 1 at 8-17.

FPS concentrated on producing and marketing compounded prescription drugs including expensive pain creams and scar creams that were available only by prescription. The Indictment alleges that FPS used sales and marketing representatives to market the medications almost exclusively to beneficiaries of TRICARE, a federal health care benefit program, for the purpose of procuring prescriptions for expensive compounded drugs and referring the prescriptions to be filled at FPS. Doc. 1 at 2, 8. During the course of the scheme, FPS submitted claims for reimbursement to TRICARE totaling approximately $54 million and TRICARE paid FPS approximately $41 million. Doc. 1 at 11-12.

The Anti-Kickback Statute makes it a federal felony to offer or pay and to solicit or receive any form of remuneration – including bribes and kickbacks – in

2

exchange for referring an individual to another person for the purpose of receiving items or services for which payment will be made by a federal health care program. See 42 U.S.C. § 1320a-7b(b)(1) and (2).  The Indictment alleges that defendant Moss, through FPS, paid illegal kickbacks and bribes totaling approximately $20,267,095 to conspirators White, Copeland, Gordon, and others, in exchange for procuring and referring prescriptions for TRICARE beneficiaries to be filled by FPS.  Doc. 1 at 9. White and Copeland then paid a portion of their kickbacks to marketers below them in the sales hierarchy in exchange for referring prescriptions to FPS.  Doc. 1 at 10.

The Indictment charges White with one count of conspiracy (in violation of 18 U.S.C. § 371) to defraud the United States and to commit the offenses of soliciting and receiving health care kickbacks (in violation of 42 U.S.C. § 1320a-7b(b)(1)) and offering and paying health care kickbacks (in violation of 42 U.S.C. § 1320a-7b(b)(2)).  The Indictment alleges that the conspiracy began in or about November 2012 and continued through in or about September 2015.  Doc. 1 at 7.  White is also charged with four substantive counts of receiving kickbacks (Counts 2, 3, 4, and 5) in violation of 42 U.S.C. § 1320a-7b(b)(1)).[1]  Doc. 1 at 18.  Altogether, Moss (through FPS) paid kickbacks to White (through Mediverse and Helix) totaling more than $15.4 million over the course of the conspiracy.

---

[1] In his motion, White erroneously states that he is charged in nine substantive counts.

B.  The Proffered Evidence of Uncharged Conduct

On June 5, 2021, about five months before trial is scheduled, the government notified the defendants in writing that it intends to introduce evidence of uncharged conduct pursuant to Rule 404(b), Fed. R. Evid., for the enumerated purposes for which such evidence is permitted under the rule.[2]  At trial, the government will offer different evidence of uncharged conduct against each of the three remaining defendants as described in the written notice to counsel.

With respect to defendant White's case, the uncharged conduct began a little more than a year after the charged FPS conspiracy ended.[3]  After receiving over $15

---

[2] The government's June 5, 2021, notice to defendant White stated:

If defendant White proceeds to trial, the United States plans to introduce evidence through documents and witness testimony as follows:

A.  Evidence of White's criminal health care fraud and kickback scheme relating to fraudulent claims for reimbursement to Medicare for genetic testing involving Personalized Genomics, LLC, Whitewater, LLC, Ravitej Reddy, Chris Miano,  Jay Piertzakowski and others.

1.  White was the owner and operator of many companies, including Whitewater, LLC, a limited liability company with its principal place of business in Panama City Beach, FL 32417.

2.  On or about May 1, 2018, White, on behalf of Whitewater, LLC, signed a "Business Services Agreement" between Personalized Genomics, LLC, and Whitewater, LLC.

3.  The contract described Whitewater, LLC, as "an administrative services organization engaged in the business of call center and back office, business development, administrative and specialty business office services and represents clients offering durable medical equipment, diabetic supplies, specialty pharmacy RX services, laboratory services and other healthcare services and products."  According to the contract, Whitewater, LLC, was to provide certain services outlined in an attachment to the contract called the "Statement of Work."

4.  The contract provided that in exchange for providing the services outlined in the "Statement of Work," Personalized Genomics, LLC would pay Whitewater, LLC $500 per hour of work performed.

5.  In truth, the contract was a sham designed to conceal an illegal kickback arrangement that White had entered into with Ravitej Reddy, Chris Miano and others.  Specifically, White solicited and

4

received illegal bribes and kickbacks from Personalized Genomics, LLC, Med Health Services Management, LP and Trinity Clinical Laboratories (the "labs"), both directly and indirectly through HSD Consultants, LLC and eLab Partners Inc., in exchange for the referral of Medicare beneficiaries, prescriptions for DNA tests and signed doctor's orders authorizing the tests to be conducted by the labs.

6.   In exchange for the referrals, White was not paid $500 per hour of work he performed; rather, he was paid illegal bribes and kickbacks in an amount equal to approximately 45% of the amount Medicare paid the labs for performing the tests, minus certain costs.

The government will introduce documents, including the May 1, 2018 "Business Services Agreement," and emails in which White acknowledged the true 45% kickback rate.  Also, the government anticipates calling Ravitej Reddy – owner of Personalized Genomics, LLC and Med Health Services Management, LP, and Christopher Miano – owner of eLab Partners, Inc., to testify about the facts above.
* * *
B.  Evidence concerning a conspiracy with Jay Piertzakowski and others to pay and receive illegal bribes and kickbacks in exchange for referrals of Medicare beneficiaries for medically unnecessary genetic testing.

The government will offer testimony from Jay Piertzakowski who is expected to testify substantially as follows:

1.   From January 2017 through August 2019, White, Piertzakowski and others knowingly participated in a criminal conspiracy to commit health care fraud, wire fraud and the payment and receipt of health care bribes and kickbacks, in which they brokered Medicare beneficiaries and procured and referred doctor's orders for medically unnecessary genetic testing to laboratories in exchange for kickbacks.

2.   Piertzakowski, a resident of Saint John's County, Florida, owned and operated a marketing company, Strive Industries Pro Advantages, LLC ("Strive").  WHITE, a resident of Bay County, Florida owned and operated a marketing company, Helix Management Solutions, LLC ("Helix"), and several other companies including Mediverse, LLC ("Mediverse").

3.   Pietrzakowski, through Strive, brokered Medicare beneficiaries to White and Helix in exchange for illegal bribes and kickbacks he received from White.  Through Strive and Helix, Pietrzakoski and White referred Medicare beneficiaries to laboratories for medically unnecessary genetic tests, in exchange for illegal bribes and kickbacks.  The laboratories included Lab Solutions, LLC; Trinity Clinical Laboratories, LLC; Personalized Genetics, LLC; CQuentia NGS, LLC; Total Diagnostix II, LLC; and Med Health Services Management, LP (together, the "laboratories").  The laboratories were Medicare providers that purported to provide laboratory testing services for Medicare beneficiaries.

4.   At first, the kickbacks were a percentage of the paid reimbursement claims or a flat rate per test.  Later, in order to disguise the illegal scheme, White described the kickbacks as hourly marketing services.  White falsely represented that Helix would pay Pietrzakowski and Strive for hourly marketing services when, in fact, the payments were illegal bribes and kickbacks in exchange for patient referrals to the laboratories.  In reality, the illegal kickbacks were calculated based on a percentage or a flat rate per patient that the laboratories collected from insurance, including Medicare.  White further disguised these payments through the creation of sham invoices for purported hourly marketing services.  White and Pietrzakoski brokered Medicare beneficiaries to the

5

million in kickbacks from FPS during the conspiracy in this case, White devised and executed a new scheme to defraud Medicare that have been investigated in several federal districts including the Middle District of Florida.  Quite simply, White's new scheme involved generating prescriptions for medically unnecessary – and very expensive – DNA or genetic tests performed by laboratories that would bill Medicare and pay kickbacks to White and others.  Although the scheme utilized several laboratories, business entities, and co-conspirators, it was actually a unified Medicare

---

laboratories for genetic testing even though the tests were medically unnecessary and ordered by a doctor who was not in fact treating the beneficiary and did not have a legitimate doctor-patient relationship with the beneficiary.

5.   White, and his co-conspirators obtained signed doctors' orders for these genetic tests by conducting a telemarketing campaign directed at Medicare beneficiaries.  White, and his co-conspirators then paid bribes and kickbacks to telemedicine companies in exchange for doctors' orders authorizing genetic tests.  White and Pietrzakowski understood that the tests were ordered by doctors, including telemedicine doctors, who were not going to use the results in the management of the beneficiaries' specific medical problems because there was no legitimate doctor-patient relationship between the prescribing doctors and the Medicare beneficiaries.

6.   In total, beginning in or around January 2017 and continuing through in or around August 2019, the laboratories paid White and Helix approximately $49,480,836.78 in bribes and kickbacks.  In turn, White and Helix paid Pietrzakowski and Strive approximately $456,973 in bribes and kickbacks in exchange for the patient referrals for genetic testing.  As a result, during the course of the conspiracy, White, Pietrzakowski, and their co-conspirators caused the laboratories to submit over $100 million in false and fraudulent claims for reimbursement from Medicare for genetic tests that were not medically necessary, and that were procured through the payment of illegal kickbacks and bribes.

The government will obtain and produce the appropriate *Giglio* and *Jencks* materials applicable to Pietrzakowski and produce discovery materials as appropriate. In addition, the government may present testimony of SA Julie Gray, DHHS-OIG and SA Eric Petersen, FBI concerning their investigation and the financial documents necessary to prove the monetary transfers described above.  Copies of these documents will soon be produced in discovery.  The government may call additional witnesses to testify concerning this matter as they become available and will notify the defendants in advance.

[3] Evidence at trial will show that the FPS scheme ended because the source of the money dried up when Tricare changed its reimbursement policy for compounded prescriptions in May 2015.

fraud conspiracy involving fraudulent claims for genetic testing in exchange for lucrative kickbacks and using the same manner and means, with White at the center of the scheme as the organizer or "mastermind."  The proffered evidence of White's new scheme is summarized as follows:

1. The Whitewater/Personalized Genomics Medicare Fraud

White owned Whitewater, LLC ("Whitewater"), a company that recruited Medicare beneficiaries for cancer genetic testing ("CGx") and obtained buccal swabs from the Medicare beneficiaries that were necessary to conduct the CGx testing. White, through Whitewater, would send the completed CGx buccal swabs to Christopher Miano, the owner of eLab Partners, Inc. ("eLab").   Miano, through eLab, would obtain the completed CGx swabs and send those on to various laboratories that would conduct CGx testing.  The laboratories would obtain Medicare reimbursements for the genetic testing and pay Miano and White a portion of the Medicare reimbursement as a kickback.

As part of this scheme, White entered into sham contracts designed to hide the fact that that White was being paid a percentage of the Medicare reimbursements. On May 1, 2018, White signed an agreement between Whitewater and Personalized Genomics under which Whitewater purported to provide various business services at a rate of $500 per hour.  The contract was a sham designed to conceal an illegal kickback agreement that White had entered into with Ravitej Reddy, Miano and others.  In fact, White was not paid $500 per hour of work; rather, he received

kickbacks equal to about 45% of the amount Medicare paid the labs for the tests that was fraudulently disguised as hours worked at $500 per hour.

Both Ravitej Reddy[4] and Chris Miano[5]  have entered pleas of guilty and agreed to cooperate with the government.  The government anticipates that testimony regarding White's involvement with Miano and others will  be brief and will be narrowly focused on the nature of the illegal kickback arrangement with White.  The government will also offer a few documents including emails exchanged among the parties that describe and confirm the kickback arrangement and the sham hourly billing, Medicare claims data and enrollment records, and relevant bank account records.

2. The Strive Industries Pro Advantages Medicare Fraud

During the FPS conspiracy, Jay Pietrzakowski operated as a sales consultant for FPS and worked under Chris White who was his superior in the payment hierarchy.  Pietrzakowski is expected to testify that he reported his prescription referrals to FPS through White, and that White paid Pietrzakowski kickbacks from the money FPS paid White based on the paid TRICARE claims for those prescriptions.  White kept a portion of the kickbacks for himself.

After the FPS conspiracy ended, White and Pietrzakowski conspired to defraud Medicare involving genetic testing.  The evidence will show that from

---

[4] *United States v. Ravitej Reddy*, 2:19-CR-00357-WSS (Western District of Pennsylvania).  Sentencing is scheduled for January 10, 2022.

[5] *United States v. Christopher Miano*, 0:19-CR-60276-AHS-1 (Southern District of Florida).  Sentencing is scheduled for October 14, 2021.

January 2017 through August 2019, White devised and executed a scheme to commit health care fraud, wire fraud and payment/receipt of kickbacks, along with Pietrzakowski and others, in which they brokered patients and referred doctors' orders for expensive and medically unnecessary genetic testing to laboratories in exchange for kickbacks.

Pietrzakowski owned Strive Industries Pro Advantages, LLC ("Strive") and White owned Helix Management Solutions, LLC ("Helix"), along with Mediverse, LLC.[6]  As part of their scheme, Pietrzakowski, through Strive, brokered Medicare beneficiaries to White and Helix in exchange for illegal bribes and kickbacks he received from White.  White, and his co-conspirators obtained signed doctors' orders for medically unnecessary genetic tests by conducting a telemarketing campaign directed at Medicare beneficiaries.  White, and his co-conspirators then paid bribes and kickbacks to telemedicine companies in exchange for doctors' orders authorizing genetic tests.

Then, through Strive and Helix, Pietrzakoski and White referred Medicare beneficiaries to laboratories for medically unnecessary genetic tests, in exchange for illegal bribes and kickbacks.  At first, the kickbacks were a percentage of the paid Medicare claims but later, in order to disguise the illegal scheme, White described the kickbacks as hourly marketing services.  White further disguised these payments

---

[6] Helix was a medical billing company, owned by White and Wes Moss, co-defendant in this case. Helix submitted FPS claims for reimbursement to TRICARE and other health care benefit programs in return for a fee.  Mediverse was a pharmacy consulting and marketing company that was owned by White.  Doc. 1 at 3.  White continued to use these companies in execution of the genetic testing Medicare fraud scheme.

through the creation of sham invoices for purported hourly marketing services, just as he did in the Personalized Genomics aspect of his scheme with Miano and Reddy described above.

Beginning in January 2017 and continuing through August 2019, White, Pietrzakowski, and their co-conspirators caused the laboratories to submit over $100 million in false and fraudulent claims for reimbursement to Medicare for genetic tests that were not medically necessary, and that were procured through the payment of illegal kickbacks and bribes.  In turn, the laboratories paid White and Helix approximately $49,480,836.78 in bribes and kickbacks.  Then, White and Helix paid Pietrzakowski and Strive approximately $456,973 in bribes and kickbacks in exchange for the patient referrals for genetic testing.

Testimony about the proffered evidence is expected to be brief and will be narrowly focused on the illegal kickback arrangements for referral of genetic testing with White, and White's attempt to disguise the kickbacks as hourly work performed.  The government will also offer a few documents including emails exchanged among the parties that describe and confirm the kickback arrangement and the sham hourly billing, Medicare claims data and enrollment records, and relevant bank account records.

Thus, the proffered evidence showing that White paid and/or received health care kickbacks from other sources and at other times but in similar fashion, would be directly relevant to prove his motive, opportunity, intent, preparation, plan,

10

knowledge, and absence of mistake or accident, as expressly permitted by Rule 404(b).

## II.  MEMORANDUM OF POINTS AND AUTHORITIES

A.  The Uncharged Conduct Evidence Proffered Against Defendant White is Relevant and Admissible for the Purposes Enumerated in Rule 404(b) and Should Not Be Excluded.

Rule 404(b) provides, in pertinent part (emphasis added):

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence *may be admissible for* another purpose, such as *proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident*.

While the rule includes a notice provision, any argument in defendant's motion concerning a lack of proper notice should be summarily rejected.  Here, the government properly described, in great detail, all of the areas of evidence at issue in its 8-page, June 5, 2021, disclosure letter, which is approximately five months prior to the scheduled trial date of November 1, 2021.

Rule 404(b) is a rule "of inclusion which allows extrinsic evidence unless it tends to prove only criminal propensity.  The list provided by the rule is not exhaustive and the range of relevancy outside the ban is almost infinite."  *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008) (brackets omitted). "[A]ccordingly, 404(b) evidence, like other relevant evidence, should not be lightly excluded when it is central to the prosecution's case."  *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (internal citations and quotations omitted).

Relevant evidence offered under Rule 404(b) may not be excluded until the Court conducts the requisite balancing test under Rule 403.[7]  To prevail on his motion *in limine*, defendant White must show that the danger of ***unfair prejudice significantly outweighs*** the strong probative value of the evidence.  The factors determining this analysis include "the strength of the government's case on the issue of intent, the overall similarity of the extrinsic and charged offenses, the amount of time separating the extrinsic and charged offenses and whether it appeared at the commencement of trial that the defendant would contest the issue of intent." *Muscatell,* 42 F.3d at 631; *United States v. Dorsey,* 819 F.2d 1055, 1061 (11th Cir.1987), *cert. denied,* 486 U.S. 1025 (1988).

Where, as here, defendants are charged with executing a continuing scheme to defraud and commit offenses against the United States, characterized by the payment of kickbacks in exchange for referral of prescriptions, it is necessary for the government to prove knowledge and intent.  In developing proof of intent, the government may offer all of the surrounding circumstances that are relevant. *Muscatell,* 42 F.3d at 631, *citing United States v. Dula,* 989 F.2d 772, 777 (5th Cir.) *cert. denied,* 114 S. Ct. 172 (1993).  *Accord, United States v. Martin*, 2019 WL 421833 *2 (M.D. Fla., 8:17-CR-301-T-24-AAS, Bucklew, J.).

---

[7] Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In every conspiracy case, "a not guilty plea renders the defendant's intent a material issue," unless the defendant affirmatively makes it a non-issue. *United States v. Matthews,* 431 F.3d 1296, 1311 (11th Cir.2005). In the instant case, the element of knowledge and intent are likely to be the focus of the defense. Here, there is no danger of unfair prejudice from evidence that White committed a variety of other crimes different from the charged offenses; rather, White's new genetic testing kickback scheme is very similar to the charged FPS kickback scheme and uses the same *modus operandi*. White's new kickback scheme was formed after the FPS conspiracy ended because White needed a new source of illegal income. These factors make the evidence ***more probative*** and ***less prejudicial***.

Thus, merely arguing that certain Rule 404(b) evidence is prejudicial is not enough to warrant exclusion under the Rule, since virtually all evidence presented against a defendant can be considered prejudicial. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1119 (11th Cir. 1990). Instead, exclusion of Rule 404(b) evidence is warranted "only when the evidence creates a danger of ***unfair*** prejudice that substantially outweighs the probative value of the evidence." *Id.* This is because "Rule 403 is an extraordinary remedy which must be used sparingly as it results in the exclusion of concededly probative evidence." *US Infrastructure, Inc.*, 576 F.3d at 1211; *United States v. Kapordelis*, 569 F.3d 1291, 1313 (11th Cir. 2009). Determinations as to the admissibility of evidence rest largely with the sound discretion of the trial court and will not be reversed on appeal absent a clear showing

13

of abuse of discretion. *Muscatell*, 42 F.3d at 630; *United States v. Cardenas* 895 F.2d 1338, 1342-43 (11th Cir. 1990).

Thus, pursuant to Rule 404(b), evidence is not automatically inadmissible where it may be extrinsic to the charged conduct or where the conduct is subsequent to the charged conduct. Rule 404(b) permits the introduction of extrinsic evidence of an uncharged act as long as the government can demonstrate: (1) a proper purpose for introducing the evidence; (2) that the prior act occurred, and that the defendant was the actor; and (3) that the probative value of introducing the evidence outweighs any prejudicial effect the evidence might have. *United States v. Troya,* 733 F.3d 1125 (11th Cir. 2013); *United States v. Cancelliere*, 69 F.3d 1116, 1124 (11th Cir. 1995); *see also Kapordelis*, 569 F.3d at 1313-1314.

First, the permissible purpose of the evidence is to prove White's motive, intent, knowledge, preparation, *modus operandi* (common plan, scheme, or design) and absence of mistake or accident. As noted above, a defendant's intent is a material element in all fraud cases and especially so where, as here, a defendant is likely to assert a defense of good faith.

The determination as to whether the second element has been established–that the defendant committed the act–only requires a finding that the jury *could* determine that the defendant committed the act. *Huddleston v. United* States, 485 U.S. 681 (1988); *United States v. Shores*, 966 F.2d 1383, 1386 (11th Cir. 1992). For example, courts have allowed the use of the uncorroborated word of an accomplice to provide a sufficient basis for concluding that a defendant committed an extrinsic act

admissible under Fed. R. Evid. 404(b). *United States v. Dickerson*, 248 F.3d 1036, 1047 (11th Cir. 2001); *United States v. Bowe*, 221 F.3d 1183 (11th Cir. 2000). Even conduct that was the subject of a previous prosecution that resulted in an acquittal is admissible under Rule 404(b). *Dowling v. United States*, 493 U.S. 342, 348 (1990); *United States v. Mathurin*, 868 F.3d 921, 930 (11th Cir. 2017). In *United States v. Veltmann*, 6 F.3d 1483 (11th Cir. 1993), the government offered no evidence that the defendant perpetrated the extrinsic offense. But here, there can be little doubt that White designed the schemes along with his co-schemers, performed the acts, and collected the money. Based on the proffered evidence described above, there is more than a sufficient basis for the jury to conclude that White committed this conduct.

Moreover, the unlawfulness of an act is irrelevant in determining admissibility under Rule 404(b), so long as the act is probative of a material issue other than defendant's character. *Kapordelis*, 569 F.3d at 1313 (no merit to argument that evidence of acts in Prague cannot be admitted under Rule 404(b) because acts were legal under law of Czech Republic); *and see United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995), *cert. denied,* 516 U.S. 1049 (1996) (principles governing other crimes evidence are the same whether conduct occurs before or after charged conduct, and regardless of whether activity might give rise to criminal liability).

Extrinsic evidence of uncharged conduct may be admitted to prove intent, where the acts or conduct require the same intent as the charged conduct and the jury could conclude that a defendant committed the other acts or conduct. *See, e.g.,*

15

*Pessefall*, 27 F.3d 511, 516-17 (11th Cir. 1994).  For example, where defendants merely assert that they did not intend to defraud the victim, the Eleventh Circuit has made clear that the defendants' other similar financial dealings are admissible to prove intent.  *See, e.g., Ellisor*, 522 F.3d at 1267-68; *United States v. Pry*, 625 F.2d 689, 691-92 (5th Cir. 1980) (in a false claims case, extrinsic evidence of other conduct relevant and admissible to prove knowledge and intent); *United States v. Rush*, 240 F.3d 729 (8th Cir. 2001) (where intent or knowledge is contested and probative value of other conduct to the issue of intent or knowledge outweighs dangers of unfair prejudice, proof is admissible).

Another factor a court may consider in evaluating admissibility under Rule 404(b) is whether the bad act is not too remote in time from the charged conduct. Here, White's new genetic testing scheme followed the FPS scheme by less than two years; a fact that should enhance its relevance and admissibility in the FPS case.

In their motions, defendants argue that evidence of uncharged conduct occurring after the charged conduct should be automatically inadmissible.  This is not the law.  Indeed, defendant White's motion concedes this issue.[8]  In this case, evidence of the uncharged genetic testing fraud schemes is actually ***more*** relevant to prove White's intent precisely because it followed the FPS scheme.  White's

---

[8] White's motion quotes a helpful passage from *Dickerson*, 248 F.3d at 1046 (11th Cir. 2001): "The principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged, and regardless of whether the activity might give rise to criminal liability."

leadership role in the FPS scheme allowed him to gain knowledge and experience that he used to design and implement the genetic testing fraud and kickback schemes.

The Eleventh Circuit and other courts have held that it is immaterial for purposes of Rule 404(b) whether the uncharged conduct occurred before or after the offenses charged in the indictment. *Dickerson*, 248 F.3d at 1046, quoting *Delgado*, 56 F.3d at 1365 ("[T]he principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged . . . ."); see also *United States v. Latney*, 108 F.3d 1446, 1449 (D.C. Cir. 1997) ("One therefore cannot formulate a general rule, as [defendant] proposes, that any bad act committed more than a certain time after the charged offense is inadmissible under Rule 404(b)"); *United States v. Olivo*, 80 F.3d 1466, 1469 (10th Cir. 1996) ("To the extent [defendant] argues there is an absolute rule regarding the number of months that can separate the charged offense and subsequent similar acts, we disagree.  Regardless of whether 404(b) evidence is of a prior or subsequent act, its admissibility involves a case-specific inquiry that is within the district court's broad discretion").

The similarity of the FPS scheme to the genetic testing scheme enhances the relevance of the proffered uncharged conduct evidence in this case.  There are several common factors that demonstrate the relevance of the evidence of the genetic testing scheme – the uncharged conduct at issue here – and its admissibility for the permissible purposes enumerated in Rule 404(b):

- Both the FPS pharmacy scheme and the genetic testing scheme involve patient brokering and identification of TRICARE or Medicare beneficiaries through various marketing methods including telephone call centers.

- Both schemes involved the identification of beneficiaries and the illicit generation and referral of prescriptions for expensive medications or lab tests to particular pharmacies or laboratories that agreed to pay lucrative kickbacks in return for the referrals.

- In almost all cases, the prescriptions for expensive medications or lab tests were not medically necessary and they were not prescribed based on a medical examination of the beneficiary.

- The beneficiaries who received the expensive medications or lab tests did not have a traditional doctor/patient relationship with the prescribing doctor who many times was unknown to the beneficiary.

- The beneficiary/patient did not choose the pharmacy or laboratory that provided the prescriptions or performed the tests because the providers were participants in the fraudulent scheme.

- White and his co-conspirators received kickback payments based on a percentage of the claims paid by TRICARE or Medicare, federal health care programs, and then sought to disguise the kickbacks as payment for business services performed.

White was able to do all this based on the knowledge and intent he developed as a leader in the FPS scheme. White's subsequent design and execution of the genetic testing scheme is highly probative of his motive, preparation, plan, knowledge, and intent as an element of the government's proof in the instant FPS case. Thus, the evidence should not be excluded under Rule 403, because the enhanced probative value of the evidence substantially outweighs any danger of unfair prejudice.

18

Finally, the presentation of this evidence will not be time consuming at trial; the comments of defense counsel that this will be a "mini-trial" are simply an incorrect hyperbole for rhetorical purposes.  The purpose of this evidence is not to prove the elements of *different crimes* beyond a reasonable doubt, but only to show that White committed certain acts that demonstrate his criminal intent in *this* case.  As argued above, this relatively brief, narrowly focused evidence will not be unfairly prejudicial and it will not confuse the issues, mislead the jury, or waste time such that it would be subject to exclusion under Rule 403, Fed. R. Evid.  Relevant evidence of intent, in a criminal fraud case, is important evidence and should not be excluded arbitrarily under the guise of saving time.  As the Eleventh Circuit has said, ". . . 404(b) evidence, like other relevant evidence, should not be lightly excluded when it is central to the prosecution's case." *Jernigan*, 341 F.3d at 1280.

### III.  CONCLUSION

The evidence of uncharged conduct proffered against defendant White is relevant and properly admissible for the purposes enumerated by Rule 404(b) to show White's motive, intent, preparation, plan, knowledge, and/or absence of mistake.  The enhanced probative value of the proffered evidence significantly outweighs the danger of unfair prejudice, if any.  Therefore, defendant White's motion *in limine* is without merit and should be denied.

Respectfully submitted,

KARIN HOPPMANN
Acting United States Attorney


By:   _/s/ John A. Michelich_
      John A. Michelich
      Senior Litigation Counsel
      United States Department of Justice
      Criminal Division, Fraud Section
      Special Florida Bar No. A5502197
      john.michelich@usdoj.gov
      office   813-274-6069
      mobile 202-355-5653

**U.S. v. Moss, Et al.**                    **Case No. 8:20-CR-00165-MSS-AAS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 20, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which

will send a notice of electronic filing to all counsel of record.


By:     */s/ John A. Michelich*
        John A. Michelich
        Senior Litigation Counsel
        United States Department of Justice
        Criminal Division, Fraud Section
        400 N. Tampa St., Suite 3200
        Tampa, FL  33602
        Special Florida Bar No. A5502197
        (813) 274-6069
        John.michelich@usdoj.gov