FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.

EDWARD CHRISTOPHER WHITE, JR.

CASE NO. 8:20-cr-165-T-35AAS
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)

## SUPERSEDING INFORMATION

The Acting United States Attorney charges:

## COUNT ONE
### (Conspiracy)

### A. **Introduction**

At all times material to this Information:

### **The Defendant and Related Entities**

1.    Defendant EDWARD CHRISTOPHER WHITE, JR. was a resident of Panama City Beach, Florida.

2.    Mediverse, LLC ("Mediverse") was a limited liability company formed under the laws of the State of Florida with its principal place of business in Panama City Beach, Florida and Miramar Beach, Florida. EDWARD CHRISTOPHER WHITE, JR. controlled and operated Mediverse.

3.    Helix, LLC ("Helix") was limited liability company formed under the laws of the State of Florida with its principal place of business located in

Dade City Beach, Florida; Panama City Beach, Florida; and Miramar Beach, Florida. EDWARD CHRISTOPHER WHITE, JR. co-owned Helix.

4.   Whitewater, LLC ("Whitewater") was a limited liability company formed under the laws of the State of Florida with its principal place of business located in Panama City Beach, Florida. EDWARD CHRISTOPHER WHITE, JR. owned and controlled Whitewater.

5.   White Medical, LLC ("White Medical") was a limited liability company formed under the laws of the State of Florida with its principal place of business located in Panama City Beach, Florida.    EDWARD CHRISTOPHER WHITE, JR. owned and controlled White Medical.

6.   Florida Pharmacy Solutions ("FPS") was a company formed under the laws of the State of Florida with principal places of business in Dade City and Zephyrhills, Florida.

7.   James Wesley Moss ("Moss") was a resident at various times of Panama City Beach and Zephyrhills, Florida. Moss was a co-owner of FPS and Helix.

8.   David Byron Copeland ("Copeland") was a resident of Tallahassee, Florida and was a co-owner of FPS, and he also served as a Regional Sales Consultant for FPS.

2

9.     TDSNOLE1, LLC ("TDSNOLE1") was a limited liability company formed under the laws of the State of Florida with its principal place of business located in Tallahassee, Florida.  Copeland owned and controlled TDSNOLE1.

10.     Michael Alton Gordon ("Gordon") was a resident of Tallahassee, Florida and worked as a pharmaceutical sales and marketing representative and as a Service Consultant for FPS.

11.     Mike Gordon, LLC was a limited liability company formed under the laws of the State of Florida with its principal place of business located in Tallahassee, Florida.  Gordon owned and controlled Mike Gordon, LLC.

12.     Balanced RX, LLC ("Balanced") was a limited liability company formed under the laws of the State of Florida law with its principal place of business located in Tampa, Florida.  Gordon owned and controlled Balanced.

13.     LabSolutions, LLC ("LabSolutions") was a Medicare provider with its principal place of business located in Atlanta, Georgia that purported to provide genetic testing to Medicare beneficiaries.

14.     Personalized Genetics, LLC ("Personalized Genetics") was a Medicare provider with its principal place of business located in Pittsburgh, Pennsylvania that purported to provide genetic testing to Medicare beneficiaries.

15.     Med Health Services Lab ("MHS") was a Medicare provider with its principal place of business located in Monroeville, Pennsylvania that purported to provide genetic testing to Medicare beneficiaries.

16.     Trinity Clinical Laboratories ("Trinity") was a Medicare provider with its principal place of business located in Lewisville, Texas, that purported to provide genetic testing to Medicare beneficiaries.

## TRICARE Program

17.     The TRICARE program ("TRICARE") was a health care benefit program of the United States Department of Defense ("DOD"), Military Health System, which provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.   Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries.  The Defense Health Agency ("DHA"), an agency of the DOD, was responsible for overseeing and administering TRICARE.

18.     TRICARE was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

19.     TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional.  Express Scripts, Inc. ("Express

4

Scripts") administered TRICARE's prescription drug benefits.

20.     TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. If a beneficiary chose a network pharmacy, the pharmacy would collect any applicable co-pay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, which would in turn adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

### Compounded Medication

21.     In general, compounding was a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combined, mixed, or altered ingredients of a drug or multiple drugs to create a prescription tailored to the needs of an individual patient. Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"); that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs. The Florida State Board of Pharmacy regulated the practice of compounding in the State of Florida.

22.     Compounded drugs may have been prescribed by a physician when an FDA-approved drug did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative, a compounded drug could be prepared excluding the substance that triggered the allergic reaction. Compounded drugs may also have been prescribed when a patient could not consume a medication by traditional means, such as an elderly patient or child who could not swallow an FDA-approved pill and needed the drug in a liquid form that was not otherwise available.

**Medicare Program**

23.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations.  The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare.  Individuals who received benefits under Medicare were commonly referred to as Medicare beneficiaries.

24. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

25. Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of Medicare covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. "Part B" covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

26. Physicians, clinics, and other health care providers, including laboratories, that provided services to beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for service provided to beneficiaries.

27. A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing

7

codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

**Part B Coverage and Regulations**

28.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

29.     The MAC for the consolidated Medicare jurisdictions that covered Florida was First Coast Service Options, Inc.

30.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required

to be signed by an authorized representative of the provider.  CMS Form 855B

contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program
> instructions that apply to this provider.  The Medicare laws,
> regulations, and program instructions are available through the
> Medicare contractor.  I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations and program
> instructions (including but not limited to, the federal anti-kickback
> statute and the Stark law), and on the provider's compliance with
> all applicable conditions of participation in Medicare.

31.     CMS Form 855B contained additional certifications that the

provider "will not knowingly present or cause to be presented a false or

fraudulent claim for payment by Medicare and will not submit claims with

deliberate ignorance or reckless disregard of their truth or falsity."

32.     Payments under Part B were often made directly to the health care

provider rather than to the patient or beneficiary.  For this to occur, the

beneficiary would assign the right of payment to the health care provider.  Once

such an assignment took place, the health care provider would assume the

responsibility to submitting claims to, and receiving payments from, Medicare.

### Cancer Genomic Testing

33.     Cancer genomic ("CGx") testing used DNA sequencing to detect

mutations in genes that could indicate a higher risk of developing certain types

of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

34. Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions covered by Medicare were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

35. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical

10

problem." *Id.* "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

36.    Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.   Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

### Telemedicine

37.    Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

38.    Telemedicine companies provided telemedicine or telehealth services to individuals by hiring doctors and other health care providers. Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

39.    Part B covered expenses for specified telehealth services if certain requirements were met.   These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were

11

delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

### B. The Conspiracy

40.    Beginning in or around November 2012, and continuing through in or around August 2019, in the Middle District of Florida, and elsewhere, the defendant,

EDWARD CHRISTOPHER WHITE, JR.,

did willfully and knowingly combine, conspire, confederate, and agree with others known and unknown to the Grand Jury:

      a. to defraud the United States by impairing, impeding, obstructing and defeating through deceitful and dishonest means, the lawful government functions of the United States Department of Health and Human Services, in its administration and oversight of Medicare; and the United States Department of Defense, in its administration and oversight of TRICARE; and

12

    b. to commit offenses against the United States, that is:

        i.    soliciting and receiving remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(1); and

        ii.   offering and paying remuneration, in violation of 42 U.S.C. § 1320a-7b(b)(2).

### Purpose of the Conspiracy

41.    It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in return for referring TRICARE and Medicare beneficiaries for compounded medications and genetic testing; and (b) causing the submission of claims to TRICARE and Medicare for compounded medications and genetic testing that were medically unnecessary.

### Manner and Means of the Conspiracy

42.    The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

    a. It was part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. would and did create and control Mediverse, Helix, Whitewater, and White Medical.

    b. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. would and did conspire with Moss, Copeland, Gordon, and others to defraud the United

13

States, as well as to pay and receive kickbacks and bribes from TRICARE reimbursements.

c. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR., Moss, and other co-conspirators would and did submit false and fraudulent claims to TRICARE for expensive compound drugs in order to "test bill" and learn whether TRICARE would pay a claim for compounded medication.

d. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR., Moss, and other co-conspirators would and did submit "test bills" to TRICARE to determine which compounded ingredients would reimburse the highest.

e. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR., Moss, and other co-conspirators would and did request that doctors sign "Blanket Letters of Authorization" that purported to authorize FPS to alter the ingredients of any compounded prescription without any additional consultation with, or permission from, the prescribing doctor and without obtaining a new

14

prescription, for the purpose of ensuring reimbursement to FPS from TRICARE and thus maximizing the profitability of FPS.

f. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. and his co-conspirators would and did cause the submission of false and fraudulent claims to TRICARE for compounded medications, of which TRICARE reimbursed approximately $22 million, for medications purportedly dispensed to TRICARE beneficiaries that WHITE referred to FPS in exchange for kickbacks.

g. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. would and did solicit and receive kickbacks from others involved in the compound pharmacy scheme.

h. It was further part of the conspiracy that on or about June 15, 2015, EDWARD CHRISTOPHER WHITE, JR. would and did solicit and receive a $4.9 million kickback payment in exchange for referring TRICARE beneficiaries to FPS.

i. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. and his co-conspirators would

15

and did utilize Helix, Whitewater, and White Medical to recruit Medicare beneficiaries for medically unnecessary CGx testing.

j. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. and his co-conspirators would and did refer Medicare beneficiaries to laboratories, including LabSolutions, MHS, Personalized Genetics, and Trinity for medically unnecessary CGx testing in exchange for kickbacks and bribes.

k. It was further part of the conspiracy that EDWARD CHRISTOPHER WHITE, JR. and his co-conspirators would and did conceal the kickbacks and bribes by entering into sham contracts that falsely represented that the laboratories were paying for hourly marketing services, when, in fact, the payments were kickbacks and bribes in exchange for beneficiary referrals to the laboratories.

l. It was further part of the conspiracy that between approximately January 2017 and August 2019, LabSolutions would and did receive approximately $19,699,934 from Medicare for CGx testing for Medicare beneficiaries

16

EDWARD CHRISTOPHER WHITE, JR. recruited and referred.

m. It was further part of the conspiracy that Personalized Genetics, MHS, and Trinity would and did received approximately $12 million from Medicare for CGx testing for Medicare beneficiaries that EDWARD CHRISTOPHER WHITE, JR. recruited and referred.

n. It was further part of the conspiracy that LabSolutions paid EDWARD CHRISTOPHER WHITE, JR. or his companies approximately $15,061,317 in exchange for referring Medicare beneficiaries to LabSolutions.

o. It was further part of the conspiracy that Personalized Genetics, MHS, and Trinity paid EDWARD CHRISTOPHER WHITE, JR. or his companies approximately $6,541,921, through a third-party company, in exchange for referring Medicare beneficiaries to Personalized Genetics, MHS, and Trinity.

### Overt Acts

43.     In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in

the Middle District of Florida, at least one of the following overt acts, among others:

    a. On or about June 15, 2015, EDWARD CHRISTOPHER WHITE, JR., through Mediverse, solicited and received kickbacks and bribes in the amount of $4,940,136.53.

    b. On or about April 22, 2015, EDWARD CHRISTOPHER WHITE, JR. caused the submission of a "Blanket Letter of Authorization" allowing FPS to alter compound prescriptions without any further approval from the prescribing doctor.

    c. On or about March 16, 2018, EDWARD CHRISTOPHER WHITE, JR. signed a contract with LabSolutions pursuant to which LabSolutions agreed to pay EDWARD CHRISTOPHER WHITE, JR., through White Medical, 45% of the monthly net revenues paid by Medicare in exchange for his recruitment and referral of Medicare beneficiaries to LabSolutions.

    d. On or about August 5, 2018, EDWARD CHRISTOPHER WHITE, JR. referred beneficiary D.L. to LabSolutions for CGx testing, along with a doctors' order authorizing the test in exchange for kickbacks and bribes.

e. On or about October 12, 2018, LabSolutions submitted claims to Medicare seeking approximately $6,470 in reimbursement for CGx testing purportedly provided to beneficiary D.L., of which Medicare paid approximately $6,315.

f. On or about January 10, 2019, LabSolutions paid EDWARD CHRISTOPHER WHITE, JR., through White Medical, approximately $1,080,535 in exchange for the referral of beneficiaries to LabSolutions.

All in violation of 18 U.S.C. § 371.

## COUNT TWO
### (Receipt of Kickbacks in Connection with a Federal Health Care Program)

44.    Paragraphs 1 through 39 of Count One of this Superseding Information are re-alleged and incorporated by reference as though fully set forth herein.

45.    On or about the date set forth in the count below, in the Middle District of Florida, and elsewhere, the defendant,

EDWARD CHRISTOPHER WHITE, JR.,

did knowingly and willfully solicit and receive, any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be

19

made in whole and in part under a Federal health care program, that is

TRICARE, as set forth below:

| Count | Approx. Date of Kickback Payment | Approx. Kickback Amount | Description of Kickback Payment |
|-------|-------------------------------|------------------------|-------------------------------|
| TWO | June 15, 2015 | $4,940,136.53 | Payment from Moss to EDWARD CHRISTOPHER WHITE, JR. |

In violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

## FORFEITURE

46.    The allegations contained in Count One and Count Two are incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

47.    Upon conviction of the violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320-a7b(b)(1)(A), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

48.    The property to be forfeited includes, but is not limited to, the following: $33,321,712, which represents the proceeds of the offense. The assets to be forfeited specifically include, but are not limited to, the following:

20

a. Real property located at 22020 Front Beach Rd, Unit 2, Panama City Beach, Florida 32413;

b. Real property located at 3232 Magnolia Islands Blvd, Panama City Beach, Florida 32408;

c. 1985 Cessna Citation SII S550 aircraft, S/N S550-0111, Tail Number N17LP;

d. 2015 Chevrolet Corvette Stingray 2-door convertible, VIN 1G1YU3D61F5606404, Florida License Plate #1J51MA;

e. 2014 Mercedes Benz ML 350 SUV, VIN 4JGDA5JBXEA351961, License Plate #LQNY28;

f. 2018 Range Rover, VIN SALWZ2SE4JA184013;

g. 2019 Mercedes-Benz Sprinter Van, VIN WDAPF1CDXKP051312;

h. $5,312.95 seized from Centennial Bank account number 503081134, held in the name of White Hewitt-Air Corp;

i. $124,280.34 seized from Centennial Bank account number 503088255, held in the name of Christopher White and Brian Moore;

j. $1,197.00 seized from Centennial Bank account number 503182370, held in the name of D.A.R.C. LLC dba D.A.R.C. Enterprises;

k. $1,910.42 seized from Centennial Bank account number 503182119, held in the name of White Medical LLC;

l. $9,742.69 seized from Centennial Bank account number 503182905, held in the name of White Oil & Gas LLC;

m. $902.81 seized from Centennial Bank account number 503182348, held in the name of Whitewater Consulting LLC;

    n. $603,818.00 seized from Regions Bank account number 0263433532, held in the name of The Edward Christopher White, Jr. Family Protection Trust; and

    o. $580,255.00 seized form Pinnacle Bank account number 800105121305, held in the name of The Edward Christopher White, Jr. Family Protection Trust.

49.    If any of the property described above, as a result of any act or omission of the defendant:

    a.   cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the Court;

    d.  has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be divided without difficulty;

22

the United States shall be entitled to forfeiture of substitute property under the

provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

KARIN HOPPMANN
Acting United States Attorney

By: _____
    Alejandro J. Salicrup
    Trial Attorney
    Criminal Division, Fraud Section
    U.S. Department of Justice

By: _____
    Carlos A. Lopez
    Trial Attorney
    Criminal Division, Fraud Section
    U.S. Department of Justice

By: _____
    Joseph S. Beemsterboer
    Acting Chief
    Criminal Division, Fraud Section
    U.S. Department of Justice

By: _____
    Frank Talbot
    Assistant United States Attorney
    Chief, Jacksonville Division