UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

    v.                                CASE NO. 8:20-CR-00165-MSS-AAS

EDWARD CHRISTOPHER WHITE, JR.

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America respectfully submits this memorandum for the Court's consideration in connection with the sentencing of Edward Christopher White, Jr. (the "Defendant").

The United States concurs with the United States Sentencing Guidelines (the "Guidelines") calculations set forth in the Defendant's Presentence Investigation Report ("PSR"), and there are no objections from the Defendant to the PSR. Thus, the parties agree that the Defendant's Guidelines range is 97-120 months' imprisonment. (PSR ¶ 98.) As such, the United States focuses its discussion on the appropriate sentence for the Defendant pursuant to the factors set forth in Title 18, United States Code, Section 3553(a).

For the reasons set forth below, the United States recommends a sentence within the Guidelines range ultimately calculated by the Court.[1] The Defendant's crimes occurred over a long period of time, netted the Defendant millions of dollars,

---

[1] As of the filing of this sentencing memorandum, the United States is still contemplating whether and to what extent to file a motion pursuant to Section 5K1.1. If it does file such a motion, and the motion is granted, the United States would recommend a sentence within the reduced Guidelines range.

1

and resulted in TRICARE and Medicare paying out over $50 million dollars for claims related to items and services that were procured by kickbacks, ineligible for reimbursement by TRICARE and Medicare, and/or were nor medically necessary. A crime of this magnitude requires a significant custodial sentence.

## **PROCEDURAL BACKGROUND**

On May 27, 2020, a federal grand jury in the Middle District of Florida, Tampa Division, returned a twenty-count Indictment charging the Defendant and three others— James Wesley Moss ("Moss"), David Byron Copeland ("Copeland"), and Michael Alton Gordon ("Gordon")—with various crimes related to a scheme to defraud the United States and to pay and receive illegal health care kickbacks in connection with a scheme to market, sell, and bill TRICARE for expensive compounded prescription drugs. (PSR ¶ 1; Doc. 1.)

On May 14, 2021, Moss pleaded guilty to Counts 1, 14, and 20 of the Indictment. (PSR at 2; Doc. 92.) Moss's sentencing is pending.

On October 1, 2021, the United States filed a two-count Superseding Information in the Middle District of Florida, Tampa Division, charging the Defendant with one count of conspiracy to defraud the United States and to pay and receive illegal health care kickbacks, and one count of soliciting and receiving illegal health care kickbacks in connection with a Federal health care program. (PSR ¶¶ 2-4; Doc. 126.) The Defendant shortly thereafter pleaded guilty to the two-count Superseding Information, pursuant to a written plea agreement. (PSR ¶ 6; Doc. 147.)

On October 12, 2021, Gordon pleaded guilty to Count 1 of the Indictment: conspiracy to defraud the United States and to pay and receive illegal health care kickbacks. (PSR at 2; Doc. 141.) Gordon's sentencing is pending.

On October 26, 2021, a federal grand jury in the Middle District of Florida, Tampa Division, returned a Superseding Indictment charging Copeland with one count of conspiracy to defraud the United States and to pay and receive illegal health care kickbacks, two counts of soliciting and receiving illegal health care kickbacks, and three counts of offering and paying illegal health care kickbacks. (PSR at 2; Doc. 166.) On December 12, 2022, a jury deadlocked on all charges against Copeland after a multiday trial. (Doc. 291.) Copeland's retrial is pending.

## THE OFFENSE CONDUCT

The plea agreement and PSR set out the Defendant's offense conduct, which consists of his participation in two types of schemes:

### A. The Compounded Prescription Drug Scheme

Beginning in or around November 2012, and continuing through in or around September 2015, the Defendant engaged in a scheme with Moss, Copeland, Gordon and others to defraud the United States and to pay and receive illegal health care kickbacks in connection with the illegal referral of prescriptions for expensive compounded drugs to FPS, a pharmacy owned by Moss and Copeland. FPS would then bill TRICARE for the expensive compounded drugs. At all relevant times, TRICARE was a health care benefit program that provided coverage for, among others, active duty service members, National Guard and Reserve members, retirees,

their families, and survivors. (PSR ¶¶ 17-18.)

As part of the scheme, the Defendant, Moss, and others submitted false and fictitious claims to TRICARE for expensive compounded prescription drugs, a practice known as "test billing," for the purpose of learning whether TRICARE would pay a claim for those prescriptions and which ingredients in a compounded prescription would result in the highest reimbursement to FPS from TRICARE. After learning whether TRICARE would pay, they reversed or withdrew the claim. (PSR ¶ 19.)

Also as part of the criminal scheme, the Defendant solicited and received the payment of kickbacks and bribes from others in exchange for procuring and referring prescriptions for expensive compounded drugs that would then be billed to TRICARE. For example, on or about June 15, 2015, the Defendant received a $4.9 million kickback payment in exchange for referring TRICARE beneficiaries to FPS. In total, FPS paid the Defendant approximately $11,718,474 in kickbacks and bribes in exchange for referring TRICARE beneficiaries to FPS for the expensive compounded drugs. TRICARE paid FPS approximately $22 million for claims that were tainted by the illegal kickbacks paid to the Defendant. (PSR ¶ 20.)

B. The Cancer Genetic Testing Scheme

The Defendant continued to conspire with others to defraud the United States and to pay and receive illegal health care kickbacks through August 2019. Specifically, the Defendant referred Medicare beneficiaries to various laboratories for medically unnecessary cancer genetic ("CGx") tests, in exchange for illegal kickbacks

4

and bribes. At all relevant times, Medicare was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. (PSR ¶ 22.)

In some cases, the Defendant concealed the kickbacks and bribes by entering into sham contracts that falsely stated that the laboratories were paying the Defendant for hourly marketing services, when in fact the payments were kickbacks and bribes in exchange for patient referrals to the laboratories—the illegal kickbacks were calculated based on a per-patient basis tethered to the amount the laboratories collected from the patients' insurance, including Medicare. (PSR ¶ 22.)

To execute the illegal scheme, the Defendant and his co-conspirators operated call centers that ran telemarketing campaigns designed to convince Medicare beneficiaries to agree to take medically unnecessary CGx tests. The Defendant and his co-conspirators then paid illegal kickbacks and bribes to telemedicine companies, in exchange for doctor's orders authorizing the genetic tests. The Defendant understood that the tests were ordered by doctors who were not going to use the results in the management of the beneficiaries' specific medical problems. (PSR ¶ 23.)

In total, from approximately January 2017 through August 2019, Medicare paid various laboratories approximately $31,699,934 for false and fraudulent claims for CGx tests that were not medically necessary, were not used to treat or diagnose a specific illness, symptom, complaint or injury of the beneficiaries, not ordered by a doctor who used the results in the management of the beneficiaries' specific medical

problems, and that were procured through the payment of illegal kickbacks and bribes to the Defendant. In exchange for his illegal services, the Defendant was paid kickbacks and bribes totaling approximately $21,603,238. (PSR ¶ 24.)

* * *

In total, the Defendant received approximately $33,321,712 in kickbacks and bribes from FPS and the laboratories. FPS and the laboratories in turn received approximately $22,000,000 from TRICARE and approximately $31,699,934 from Medicare, respectively, for the kickback-tainted claims – a total benefit conferred of approximately **$53,699,934.**

## THE PSR'S UN-OBJECTED-TO GUIDELINES CALCULATION

The PSR calculates the Defendant's total offense level as 30, with a criminal history category I, as follows:

| | | |
|---|---|---|
| Base Offense Level: | 8 | § 2B4.1(a) |
| Improper Benefit Conferred: | +22 | §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(L) |
| Aggravating Role: | +3 | § 3B1.1(b) |
| <u>Acceptance of Responsibility:</u> | <u>-3</u> | § 3E1.1 |
| **Total Offense Level:** | **30** | |

(PSR ¶¶ 34-3.) The PSR further calculated the Defendant's Criminal History Category as I. (*Id.* ¶ 49.) As a result, the PSR calculated the Defendant's Sentencing Guidelines range to be 97-120 months' imprisonment, because the counts of conviction are grouped and are capped at the statutory maximum of 120 months' imprisonment for Count 2. (*Id.* ¶ 98.)

# ARGUMENT

"When sentencing a criminal defendant, district courts are required to consider the advisory guidelines range and the factors set forth in 18 U.S.C. § 3553(a)." *United States v. Howard*, 28 F.4th 180, 204 (11th Cir. 2022) (citing *United States v. Rosales-Bruno*, 789 F.3d 1249, 1253-54 (11th Cir. 2015). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the sentencing range, (5) policy statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution. *See* 18 U.S.C. §3553(a).

Although the sentencing guidelines are only advisory, a major variance from the guidelines range "should be supported by a more significant justification than a minor one," and a court must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall v. United States*, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007); *see also United States v. Irey*, 612 F.3d 1160, 1196 (11th Cir. 2010) (en banc) ("Although there is no proportionality principle in sentencing, a major variance does require a more significant justification than a minor one ....").

In this case, the Section 3553(a) factors weigh heavily in favor of a sentence within the applicable Guidelines range ultimately calculated by the Court—either the 97-120 months' imprisonment set forth in the PSR or a reduced amount if the United States files a motion pursuant to Section 5K1.1, and the Court grants it. Such a

7

substantial custodial sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2), discussed further below.

### A. Nature and Circumstances of the Offense

The Defendant committed a massive crime over a long period of time. Over approximately seven years, the Defendant solicited and received over $33 million in kickbacks and bribes from FPS and the laboratories in exchange for referring them (i) prescriptions for expensive compounded drugs and (ii) doctor's orders for medically unnecessary CGx tests, respectively. In turn, FPS and the laboratories bilked TRICARE and Medicare out of over $53 million for the kickback-tainted claims they submitted to the Federal health care programs – programs that were designed to provide health care coverage to our nation's military, elderly, and disabled. Such conduct is grotesque. It demands a significant custodial sentence.

Indeed, as the U.S. Court of Appeals has recently recognized, such conduct is particularly problematic for the entire country:

> White collar medical crimes like [the defendant's] are serious because they can disrupt health care markets . . . . Congress has determined that medical necessity and the best interest of the patient should be the *only* reason for a physician to write a prescription; kickbacks provide a baser, non-medical reason: making unauthorized money and lots of it.

*Howard*, 28 F.4th at 207 (emphasis in original).

This factor accordingly weighs heavily in favor of imposing a sentence within the applicable Guidelines range ultimately calculated by the Court.

## B. The History and Characteristics of the Defendant

A review of the history and characteristics of the Defendant shows that, although he had a difficult relationship with his father, he ultimately believes that his father would "do anything for him" and had a loving relationship with his mother. He had access to quality educational opportunities, obtained a doctor of pharmacy, and otherwise lacked a compelling explanation to turn to crime as his primary source of income. (*See* PSR ¶¶ 53-94.) Indeed, the Defendant appears to have been motivated by greed. One statement that the Defendant made to his U.S. Probation Officer is particularly telling: "The defendant reported that he has also been upset because he was planning on retiring at age 40, and instead, he was signing a plea deal the day of his birthday." (PSR ¶ 73.) Based on his employment history, the only way that the Defendant could have retired at age 40 is if he was never caught for his crimes, i.e. the receipt of tens of millions of dollars of illegal health care kickbacks and bribes. To be "upset" that he instead needed to accept responsibility for his crimes speaks volumes about the Defendant's personal characteristics.

## C. Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment

A sentence within the applicable Guidelines range reflects the seriousness of the offense, promotes respect for the law, and provides a just sentence. The Defendant committed a very serious crime—one that continued over several years, netted him tens of millions of dollars in illegal kickbacks and bribes, and led to TRICARE and Medicare paying out over $50 million for items and services that

9

were procured by illegal kickbacks, ineligible for reimbursement, and/or were not medically necessary. It necessitates serious punishment.

Indeed, the legislative history of the Sentencing Reform Act of 1984, which created the United States Sentencing Commission, made clear that one of the Act's goals was to rectify the serious problem in the criminal justice system that white-collar offenders were not being adequately punished. See S. Rep. No. 98-225, at 77 (1983) ("[S]ome offenders, particularly white-collar offenders . . . frequently do not receive sentences that reflect the seriousness of their offenses."). As then Judge Breyer, previously an original member of the Sentencing Commission, explained:

> The Commission found in its data significant discrepancies between pre-Guideline punishment of certain white-collar crimes, such as fraud, and other similar common law crimes, such as theft. The Commission's statistics indicated that where white collar fraud was involved, court granted probation to offenders more frequently than in situations involving analogous common law crimes; furthermore, prison terms were less severe for white-collar criminal who did not receive probation. To mitigate the inequities of these discrepancies, the Commission decided to require short but certain terms of confinement for many white-collar offenders, including tax, insider trading, and antitrust offenders, who previously would have likely received probation.

See Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 20-21 (1988).

In the same vein, a sentence within the applicable Guidelines range would avoid the appearance of a two-tiered system of justice, in which white-collar defendants are treated more favorably than other defendants. Insofar as one goal of

sentencing is to promote respect for the law, it is important for the public to perceive that a well-heeled defendant who steals nearly a quarter billion dollars through fraud does not receive a more lenient sentence than a defendant who, for instance, distributes 280 grams of crack cocaine. *See* 21 U.S.C. § 841 (imposing a ten-year mandatory minimum).

**D.     Need to Deter Future Criminal Conduct**

Under Section 3553(a), the need for the sentence to "afford adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), must also be considered. Here, the United States respectfully submits that a sentence within the applicable Guidelines range is necessary to serve this purpose. The enormity of the Defendant's crimes and the seeming frequency with which such similar crimes are committed in this state is dismaying. Thus, the deterrent message and effect of a substantial custodial sentence imposed by the Court in this case will resonate significantly with any individual tempted to engage in white-collar crime like that which the Defendant perpetrated.

A Guidelines sentence is appropriate for the further reason that white-collar crime can be seriously affected by the imposition of significant, Guidelines-range sentences. As the United States Court of Appeals for the 11th Circuit has observed, "[d]efendants in white collar [cases] often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Thus, it is this type of mentality that is most amenable to deterrence. *See, e.g., id.* at 1240

11

("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crime are prime candidates for general deterrence." (internal quotation marks and alteration omitted)); *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) ("[White collar] crime is not as feared as violent crime or drug offenses, but like the latter it requires heavy sentences to deter because it is potentially very lucrative.").

A significant sentence of imprisonment—one that falls within the Sentencing Guidelines range—will help ensure that others know that fraud will result in more than a repayment order or fine, but rather will result in a meaningful, predictable prison term.

Such deterrence is needed both in society as a whole and in the United States' health care industry.

### E. Need to Avoid Unwarranted Disparities

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities." The Sentencing Guidelines have taken into account the relevant factors and are in and of themselves a means to avoid unwarranted sentencing disparities.

Indeed, the United States' recommendation of a sentence within the applicable Guidelines range is based, in part, on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission. Anchoring the sentence to the Guidelines range also serves the vital goal of uniformity and fairness in sentencing. To be sure, "[i]n accord with 18

U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Nevertheless, it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id*. at 108-09 (internal quotation marks omitted).

Furthermore, the Guidelines are often the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in creating the Sentencing Commission in the first place.

The United States therefore submits that a custodial sentence within the Guidelines range ultimately calculated by the Court is appropriate.

### F. The Court Should Not Impose a Fine

The United States does not recommend a fine, given the large amount of restitution contemplated by the PSR and that this Court must enter: $53,699,934.00, less any amounts the Defendant has already paid. The imposition of a fine would serve only to impede any payments on that large amount owed to TRICARE and Medicare.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the sentence it has requested is sufficient, but not greater than necessary, to provide just punishment to the Defendant for his crimes, promote respect for the law, and deter

the Defendant and others from committing similar crimes in the future. *See* 18 U.S.C. § 3553(a). The United States thus recommends that the Court sentence the defendant to a custodial sentence within the Guidelines range ultimately calculated by the Court.

>
> Respectfully submitted,
>
> ROGER B. HANDBERG
> United States Attorney
>
> By: */s/ John Scanlon*
> John (Fritz) Scanlon
> Assistant Chief
> United States Department of Justice
> Criminal Division, Fraud Section
> 1400 New York Avenue NW
> Washington, DC 20005
> Telephone: (202) 304-2946
> E-mail: John.Scanlon@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

*/s/ John Scanlon*
John (Fritz) Scanlon
Assistant Chief
United States Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue NW
Washington, DC 20005
Telephone: (202) 304-2946
E-mail: John.Scanlon@usdoj.gov